## Crosthwaite v. Crosthwaite, et al.

(Decided December 20, 1912.)

### Appeal from Fayette Circuit Court.

1. Wills—Contest—Evidence.—Where the evidence is conflicting on the subject of the capacity of a testator to make a will, the verdict of the jury, finding that the paper offered for probate, is not his will, will not be disturbed.

2. Jurors—Waiver of Right to New Trial for Disqualification—Challenge.—If a party knows that a juror is disqualified, or knows from answers made by a juror examined touching his qualifications, that he can be disqualified by giving him information that the juror is, at the time, ignorant of, but that will certainly be developed on the trial, and he fails to challenge the juror, or refrains from asking him questions that he knows will disqualify him, he will be estopped, after an adverse verdict, to obtain a new trial on the ground that the juror was disqualified to sit in the case.

3. Wills—Contest—Evidence.—Where witnesses are examined fully as to their qualifications to give an opinion as to the soundness of mind of a testator and are permitted to say that, in their opinion, he was competent to make a will, it is not error to refuse to

permit the witnesses to say whether, in their opinion, the testator was of sound or unsound mind.

R. F. BYRD and J. F. WALLACE for appellant.

W. C. G. HOBBS, NAT HOBBS, FORMAN & FORMAN and T. T. FORMAN for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This is a contest over the will of Perry Crosthwaite, who died in Lexington in April, 1911, leaving an estate worth between $23,000 and $25,000. In March, 1910, at the time he made the will in controversy, he was 86 years old. In his will, after directing the payment of his debts and funeral expenses, and nominating his executor, he gave to his daughter, Lula D. Crosthwaite, the appellant here, $10,000. To his daughter, Jennie R. Hobbs, he gave $1,000. To his wife, Mary, he gave the sum of $100. The balance of his estate he devised equally to his six children, Matt, Lula D., Sam H., Harry M. and William Crosthwaite, and Jennie R. Hobbs, share and share alike. He also gave to his daughter, Lula D. Crosthwaite, all of his household and kitchen furniture that she might desire to have.

In the will he assigned as a reason for giving to his daughter, Lula D., $10,000, in addition to her share of the residuary estate, "her years of tender affection in nursing and caring for me, and for her great sacrifice in caring for me during my years of sickness and health." As a reason for only giving his wife $100 he said in his will; "I have been a kind and loving husband to her, and during our married life have deeded to her real estate and personal property. I have advanced her money and kept up her property in repair and given her all the money she desired during our married life, and she has an abundance of property in her own name to keep her comfortable the rest of her days."

The will, when offered for probate in the county court, was rejected, and from the order rejecting the will Lula D. Crosthwaite prosecuted an appeal to the circuit court. Upon a trial in the circuit court before a jury a verdict was returned, finding that the paper offered was not the will of Perry Crosthwaite, and from the judgment on this verdict Lula D. Crosthwaite prosecutes this appeal.

Four grounds are relied on for reversal: (1) Because the verdict of the jury was flagrantly against the evidence, and a new trial should have been granted by the lower court; (2) Because the court erred in refusing a continuance of the case on request of appellant; (3) Because the court failed to sustain the challenge of the appellant to one of the jurors for cause; (4) Because the court erred in failing to permit Burgin, Miller and other witnesses in behalf of appellant to testify as to the soundness of mind by the testator.

Taking up these assigned errors in the order in which they have been stated, the first one makes it necessary that we should state briefly the evidence introduced by the parties to the contest. The testator, as before stated, made the will in contest about a year before he died, and when he was 86 years of age. He had been married twice, and his six surviving children were the issue of his first wife, who died some thirty years before he did. He was married to his second wife, who survived him, twenty years or more before his death, but no children were born of this marriage.

The appellant is a maiden lady, and was about 55 years old when the will was written. For many years she had suffered severely from a nervous ailment, and is shown by the evidence to have rather an excitable, nervous disposition, and little or no capacity for earning her own living. She had always made her home with her father, who made comfortable provision for her support, furnishing her not only with the necessities but with some of the luxuries of life, and if the testator had been of disposing mind the provision made for her could not be considered either unnatural or unreasonable.

All the witnesses agree that the last wife of the testator, who has a comfortable estate in her own right, is a most estimable lady, and was at all times kind and attentive to her husband, and especially faithful in the performance of her wifely duties in the latter years of his life. It is also conceded that the testator, until about four years before the will was executed, was an active, capable business man, but that about 1907 he commenced failing mentally as well as physically, and continued to decline until his death.

The paper in controversy was the only will the testator ever made, and several witnesses testified that he often said that the law made as good a will as he wanted, although there is evidence that he expressed his inten-

tion on more than one occasion, before the paper in issue was executed, of making suitable provision for the appellant, and it is also shown that after the execution of this paper he said he had made provision for her.

It is, however, quite evident that the testator never seriously contemplated making a will, and this theory is abundantly supported by the uncontroverted fact that he never attempted to make one until he was eighty-six years of age. It appears from the evidence that the appellant, in December, 1909, drafted, as she testifies, at his request, a paper intended to be a will, in which he made the same provision for her that was made in the paper offered as his will. This paper written by appellant, was sometime afterward taken to her attorney, J. Franklin Wallace, and he, after consulting with the testator, wrote the paper in issue and gave it to appellant, who retained it until it was signed by the testator, in March, 1910. On the day the paper was signed by the testator his wife was absent from home, as appellant knew, and she testified she selected this date because she was absent.

One of the attesting witnesses, Dr. F. O. Young, had been for twenty-five years the family physician of the testator, and was intimately acquainted with him, both personally and in a professional capacity. He states that he was telephoned by the appellant to come to the house of the testator, and that when he arrived there he saw for the first time the will, which was in the possession of appellant. Asked to relate what transpired and to describe the condition of the testator, he said:

"I do not know that I can tell everything about it. I read the will over to him. At first Miss Lula said there wasn't any use to read it to him; just let him sign it, and I said, 'no; I will read it to him,' and I read it to him, and he sat there in a dazed kind of condition. After I got through I don't remember who asked him to sign it. Anyhow it was pushed over to him and a bottle of ink passed to him, and he, in a very trembling condition, signed it." He further testified that the testator at the time was suffering from senile dementia and was in a very feeble condition, both mentally and physically; that he did not make any comment whatever when he signed the paper and did not request any person to witness it, and did not recognize him at first when he went into the room. He also testified that, in his opinion, the testator did not have sufficient mind to know the meaning of the paper, and that

he knew when he attested the will as a witness that the testator was not capable of making a will; that after it was written and signed he took possession of the paper at the request of appellant, the testator not giving any direction about it.   Asked why he signed the paper believing at the time that the testator did not have sufficient mental capacity to execute a will, he said: "I don't know why I did.   I wished often I had not."   He further said that he did not know the importance of his signature or that it would be necessary to prove that the testátor was of sound mind before the paper could be probated as his last will.

The other attesting witness, Thresa Horine, testifies in substance that she was a servant in the house of the testator and was called on, in connection with Dr. Young, to witness the will; that at the time she had been employed in the family for nearly a year.   She said that she had never had any business conversation or transaction with the testator, and that on more than one occasion she noticed he failed to recognize members of his family, and particularly his son, Sam Crosthwaite, who lived in the house with him.   This witness further said that at the time the will was signed the testator was quite feeble, but was sitting up in a chair by the bed; and that during the time she was there it was his habit to get up about nine o'clock in the morning and then go to bed at eleven and get up again about two in the afternoon and again retire between four and five.

A number of other witnesses, business and professional men, who were intimately acquainted with the testator, gave convincing evidence as to his mental and physical failing for three or four years before his death. Some of them testified that he would get lost on the streets of Lexington where he had lived for many years, and others said that he often failed to recognize his nearest and best friends, and yet others that he did not know what estate he owned.

On the other hand, several witnesses of intelligence and character, who were well acquainted with the testator, testified that he was competent to make a will, but we think the evidence shows that he was not and so we cannot direct a new trial on the ground that the verdict is not sustained by the evidence.

The next assigned error is the failure of the trial court to grant a continuance of the case. It appears from the record that on the 14th of November, 1911, the case

was set down for trial on November 20th. On this date
the appellant moved for a continuance, and in support
of this motion, filed her own affidavit and the affidavit of
her counsel and her physician.. One of the grounds for
continuance was that appellant was in a nervous, delicate
condition and incapable of giving to her counsel the ad-
vice and assistance they needed in the trial of the case,
and unfit, on account of her temporary mental and phys-
ical condition, to appear as a witness. Another ground
was the absence of material witnesses.

Upon considering this motion the court refused a gen-
eral continuance of the case but postponed the trial four
days. When it was again called for trial both sides an-
nounced ready; all of the witnesses appellant desired
were present in person and testified in her behalf, except
one whose deposition was read, and the appellant was
present in court, and judging from her evidence, which
we have carefully read, was fully competent and quali-
fied, not only to make a good witness in her own behalf,
but to give to her counsel such advice and assistance as
an intelligent client could. The court did not commit
any error in overruling the motion for a general con-
tinuance.

The next alleged error is the failure of the trial judge
to sustain a challenge for cause to Charles Gaitskill, who
was summoned as a juror. It appears from the record
that this juror was challenged for cause, but the court
overruled the motion to excuse him for cause, and when
a panel of eighteen qualified jurors was offered to counsel
on both sides, this juror was not stricken from the panel
by either side, although each side, peremptorily and as
a matter of right, excused three of the jurors. What
occurred, when this juror was examined and challenged
for cause, appears in the bill of exceptions signed by the
trial judge, and also. in a bystanders' bill, made up at the
instance of counsel for appellant. In the bill of excep-
tions signed by the judge it is recited that:

"In selecting and impaneling a juror for the trial of
this case Charles Gaitskill, one of the jurors who tried
this case, stated under oath when being examined by the
attorneys and by the court, touching his qualifications as
a juror to try the case, that he was acquainted with Perry
Crosthwaite during his lifetime, and knew him well, and
that he had read in the papers published in Lexington an
account of the making of the will in contest and that
there was a contest over his will as to his mental capacity.

When asked by counsel for appellant as to whether he had an opinion as to the mental capacity of said Perry, Crosthwaite to make a will and dispose of his property, he answered that it would depend upon when the will was made. Now the juror was not informed as to the date of the making of the will, and made no further answer as to whether he at the time had an opinion as to that subject. When asked by the court as to whether he had any opinion that would interfere with an unbiased verdict, after he had heard the evidence and the instructions of the court, he replied that he had not and the court thereupon overruled the challenge for cause.''

In the bystanders' bill it is set out that this juror said he had formed an opinion as to the merits of the case from what he had heard and read'of it, and also from his personal acquaintance with the testator, but did not know whether he had ever expressed the opinion. The bystanders' bill also recites that this juror, when asked by counsel for appellant as to whether he had an opinion as to the capacity of the testator to make a will, answered that it would depend on when the will was made, but that he was not informed as to the date of the making of the will.

It would seem from this that counsel for appellant were not at the time very desirous of removing this juror from the panel because they could easily have informed him as to the date of the will and the juror could then have readily said whether he had an opinion as to the capicity of the testator to make a will at that date. If this information had been given to the juror by counsel for appellant and he had said that, in his opinion, the testator was not competent to make a will in March, 1910, we have no doubt that the trial judge would, on his own motion, have excused the juror and certainly he would have done so upon the request of counsel for appellant.

It is of course of the highest importance to parties to litigation, as well as to the correct administration of justice, that jurors selected to try a case should be without bias or prejudice for or against either of the parties, and be entirely free from any fixed opinion that might lean their judgment to one side or the other. But counsel for the unsuccessful party will not be heard to complain, after they have lost the case, that a juror was disqualified for service, when they accepted him with knowledge of his disqualification or failed to show his disqualifica-

tion by asking such questions as they at the time knew would develop it.

If a party knows that a juror is disqualified or knows from answers made by a juror when examined touching his qualifications, that he can be disqualified by giving him information as to some material fact that the juror is at the time ignorant of but that will certainly be developed on the trial, and he fails to challenge the juror or refrains from asking him questions that he knows will disqualify him, he will be estopped, after an adverse verdict, to obtain a new trial on the ground that the juror was disqualified to sit in the case. When a party knowingly and freely takes the risk of accepting as favorable to him a juror that he could have removed, he must take the consequences, and if it developes that the juror had some bias or leaning, he cannot complain. If this were not true it is manifest that the party who saw proper to take his chances on getting a verdict with the juror that he might have removed, would be given an unfair advantage over his opponent. The record does not show appellant entitled to complain of the error, if there was one, in overruling the motion to challenge this juror for cause.

Another ground urged for reversal is that the trial court refused to permit several witnesses offered by appellant to answer the question, whether in the opinion of the witness the testator was of sound or unsound mind. All of the witnesses who were asked this question were examined in detail as to their qualifications to have an opinion touching the mental capacity of the testator, and they were permitted to say that, in their opinion, he had mind and memory sufficient to know the objects of his bounty, the value and character of his estate, and to dispose of it according to a fixed purpose of his own. After being permitted to answer every pertinent question that could throw light on the knowledge of the witness as to the competency of the testator, and allowed to express an opinion favorable to his ability to make a will, it was not error to refuse to permit witnesses to say whether the testator was of sound or unsound mind, as this question was fully answered in the other answers given by them.

Upon the whole case we do not find any error that would justify us in disturbing the judgment of the lower court, and it is affirmed.